UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE: § 
 §
GEORGE SCHWAN, § NO. 17-00912 (JAF)
 §
 DEBTOR. §
 §

CREDITOR LINDA DIAMOND'S MOTION TO
DISMISS CHAPTER 7 CASE PURSUANT TO 11 U.S.C. § 707(a)

---

**NOTICE OF OPPORTUNITY TO OBJECT AND REQUEST FOR HEARING**

Pursuant to Local Rule 2002-4, the Court will consider the relief requested in this paper without further notice or hearing unless a party in interest files a response within 21 days from the date set forth on the attached proof of service attached plus an additional three days for service if any party was served by U.S. Mail.

If you object to the relief requested in this paper, you must file a response with the Clerk of the Court at 300 N. Hogan Street, Suite 3-150, Jacksonville, Florida 32202-4267, and serve a copy on the movant's attorney Christian W. Waugh, Esq., 13940 U.S. Hwy 441, Suite 906, The Villages, FL 32159, and any other appropriate persons within the time allowed. If you file and serve a response within the time permitted, the Court will either schedule and notify you of a hearing, or consider the objection and grant or deny the relief requested without a hearing.

If you do not file an objection within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, will proceed to consider the paper without further notice or hearing, and may grant the relief requested.

---

Linda Diamond, in her capacity as Personal Representative of the Estate of Benjamin Diamond, as Successor Trustee of the Benjamin Diamond Revocable Trust dated 12/30/2003 and as President of Diamond Neon Supply Company, a Florida corporation (cumulatively and generally referred to hereafter as "Linda Diamond"), through her undersigned counsel, pursuant

to 11 U.S.C. § 707(a) and the Eleventh Circuit Court of Appeals' holding in *In re Piazza*, 719 F.3d 1253, 1259 (11th Cir. 2013), hereby files this motion to dismiss George Schwan's bankruptcy, and states in support thereof:

### INTRODUCTION

1. George Schwan (hereinafter, the "Debtor") cheated, schemed, and defrauded Benjamin Diamond, who was Linda Diamond's father, and this behavior was the basis for a $225,000 final judgment being entered against Debtor in state court. The manner in which Debtor procured these funds satisfies multiple provisions of 11 U.S.C. § 523(a) and thus is the subject of a Complaint to Determine and Avoid Dischargeability of Debt filed by Linda Diamond in 17-ap-115-JAF. But given the facts surrounding Debtor's petition, and this case, this Court should not even have to deal with the adversarial proceeding generated by Linda Diamond.

2. This is because Debtor's Chapter 7 case should be dismissed. The case exists solely for the purpose of stymying the advanced collections effort of Linda Diamond in state court and the damning admissions that both Debtor and Debtor's wife have made in that state court proceeding. Abundant case law, including from the Middle District of Florida itself, would support this Court finding that Debtor's Chapter 7 case should be dismissed "for cause" under 11 U.S.C. § 707(a).

3. The facts under which Debtor procured the $225,000, which comprise the bulk of Linda Diamond's proof of claim (#1), are disturbing and largely explained in Linda Diamond's aforementioned adversarial proceeding. Nonetheless, many of the facts bear repeating so that this Court has a full picture of the "causes" for which the Chapter 7 case so richly deserves dismissal under 11 U.S.C. § 707(a).

### UNDERLYING FACTUAL BACKGROUND

4. Debtor served as an employee and confidante of Benjamin Diamond, who was president and founder of Diamond Neon Supply Company, a Florida corporation of high repute that created neon signs.

5. As Benjamin Diamond slowly succumbed to the infirmities that sometimes accompany senescence, he began to lose capacity.

6. As a result, Debtor became guardian of the property for Benjamin Diamond pursuant to Chapter 744, Florida Statutes, regulating guardianships.

7. Defendant was delegated the following rights for Benjamin Diamond: (1) to manage property or make any gift or disposition of property, (2) sue and defend lawsuits, (3) apply for governmental benefits, and (4) to contract.

8. Prior to and during the guardianship, in which Debtor had a fiduciary duty to Benjamin Diamond, Debtor served as a key employee and general manager of Diamond Neon Supply Company (the "Company"), and in these capacities had unbridled control over the Company's financial accounts.

9. Inexplicably, in the final guardianship accounting provided by Debtor on behalf of Benjamin Diamond, there were no disclosures regarding management of the Company, nor distributions or payments to its employees, despite the accounting showing a not inconsiderable sum of $2,409,500.00.

10. The Company's active business ended in 2007, when dissolution and wind-up of the Company began, and all business operations finally ceased in 2008.

11. Nonetheless, Debtor paid himself $467,742.65 in 2009, comprised of a salary of $300,000.00, and a "raise in pay" of $167,222.00 for that year, both authorized by Debtor.

12. To make matters worse, Debtor paid himself a check of $225,000.00 in 2009 as a

purported advance on "future management" of the Company, despite the Company already being wound-up (hereinafter, the "Fraudulent Advance").

13. By virtue of these payments, all authorized by Debtor, Debtor managed to liquidate assets from Benjamin Diamond and the Company that would have accrued to Benjamin Diamond's intended heirs or the Company itself.

14. These payments were all individually and exclusive of each other breaches of fiduciary duty, breaches of various guardianship duties, and the like.

15. The Fraudulent Advance was procured by Debtor on December 10, 2009 by check no. 42721, drafted and signed by Debtor himself.

16. Debtor knew that the Fraudulent Advance was dependent and contingent upon both he and the Company executing a written agreement, outlining the terms and conditions for the services to be performed by Debtor in exchange for the Fraudulent Advance, which services were contemplated to go for a period of seven (7) years after the Company closed.

17. Debtor was later advised in writing by the Company to return the Fraudulent Advance, but he refused to do so.

18. Debtor did not perform any services for the Fraudulent Advance and has repeatedly admitted this.

19. Debtor received a draft written agreement for the Fraudulent Advance but never signed it and refused to sign it.

20. Although Debtor obviously committed many acts including fraud, breach of fiduciary duty, breach of guardianship duties, and so on, Linda Diamond has so far only obtained a final judgment as to the breach of purported oral contract on the Fraudulent Advance.

21. In the final judgment, issued on August 8, 2013, a senior trial judge in Pinellas

County awarded Linda Diamond $225,000.00 for the Fraudulent Advance.

22. The Company had relied on Debtor's oral representations regarding services he had performed, was performing, and would perform for the Company in order to leave him with the ability to cut himself checks and generally have control over Company finances.

23. The magnitude of Debtor's wrongful, bad faith, and fraudulent actions did not become fully apparent until much later, and by the time they were, the statute of limitations for causes of action accruing under the guardianship statutes had expired. They should nonetheless be considered as part of this Court's determination of "cause" for dismissal.

24. Debtor stripped Benjamin Diamond of personal property and real property before and during the guardianship, including acquiring real property in North Carolina at no cost from Benjamin Diamond (and later selling it for full profit to himself), taking the Fraudulent Advance, giving himself a raise from the Company, and other actions that violated Florida Statute § 744.446.

25. The North Carolina deed was executed by Benjamin Diamond at a time that Debtor knew Benjamin Diamond was incapacitated, as he became guardian of Benjamin Diamond's property days before, the day of, or mere days after the guardianship was instituted, and was characterized by Debtor's own admission in a deposition as:

- Benjamin Diamond slid a pile of "gold coins" worth $35,000 across a table to Debtor;

- Benjamin Diamond told Debtor to simply slide the pile of gold coins back to him;

- After the sliding was finished, Benjamin Diamond agreed to deed the North Carolina property to debtor;

- Debtor agrees he never paid any money, let alone $35,000, for the property;

- Debtor agrees he misled the IRS regarding the transaction, which he reported, including a basis of $35,000;[1] and

- Debtor claims he misled the IRS because "[i]t never occurred to" him.[2]

26. The actions outlined in this section committed by Debtor form the underlying factual basis for the Fraudulent Advance judgment, and the circumstances surrounding it, but are far from the only set of facts that underpin "cause" for this Court in dismissing the Chapter 7 petition.

## PROCEDURAL BACKGROUND

27. From the time of the judgment being issued in August of 2013, until early 2016, Debtor failed to pay any money.

28. In a post-judgment deposition related to collection on the judgment, Debtor admitted that he had the ability to make payments on the judgment.

29. But he also claimed that he has no intention of ever paying anything or complying with the lawful judgment, despite receiving income and paying other obligations. See: Deposition of George Schwan at 24:22-25:1; 37:24-38:4; 38:7-16.[3]

30. Debtor's confessions regarding intent are important, but they are only one aspect of Debtor's intent in this case, which was evident from a fraudulent design to protect the Fraudulent Advance (and all the other monies he stole).

31. Debtor began planning how to hide the Fraudulent Advance as early as 2012, when he deeded all of his interest in real property to his wife or other entities, such as his wife as a trustee of her brand new trust, or a new Wyoming limited liability company, that Debtor and

---

[1] A man who has no hesitation in misleading a federal bureaucracy like the IRS will have no hesitation in misleading a federal court like this one.
[2] All of these may be found in the Deposition of George Schwan pages 93 through 97, generally.
[3] Specific references to pages and lines in the depositions of George Schwan and Diane Schwan shall be in the following format throughout this Motion: [PAGE NUMBER]:[LINE NUMBER]-[PAGE NUMBER]:[LINE NUMBER] or if it is all encompassed on one page: [PAGE NUMBER]:[LINE NUMBER]-[LINE NUMBER]. Both depositions are filed with the clerk as attachments to this Motion in their entirety.

his wife created as a vehicle to hide their assets from Linda Diamond as a creditor.

32.     With intent to hinder, delay, and defraud Linda Diamond as a creditor, Debtor conveyed his interest in real property in 5325 Tuscawilla Court, Weeki Wachee, Florida 34607 (hereinafter, the "Tuscawilla Property") to his spouse, Diane Schwan, as trustee of the Diane L. Schwan Revocable Inter Vivos Trust u/a/d 01/24/2012 (created on the same day and hereinafter referred to as her "Trust"), on January 24, 2012, while reserving for himself a life estate.

33.     Diane Schwan, as trustee of her Trust, and Debtor, because of his life estate, joined in a conveyance of their interest in the Tuscawilla Property, conveying it to Right Time Investments, LLC, a Wyoming Limited Liability Company, on June 19, 2012.

34.     Right Time Investments, LLC, a Wyoming Limited Liability Company, was created on advice of counsel who jointly served George and Diane Schwan. See: Deposition of Diane Schwan, 24:9-14.

35.     Diane Schwan has admitted in her own deposition that one of the reasons for the company's creation was to protect from liabilities that arise from Debtor. See: *Id.* at 25:6-12.

36.     For her part, Diane Schwan explained that the reason for the creation of Right Time Investments, LLC was also to avoid probate Court. See: *Id.*

37.     Diane Schwan also claimed that she created her Trust to avoid Debtor's probate. See: *Id.* at 31:12-19.

38.     And yet, the deed on the Tuscawilla Property was originally in both of their names, both Debtor and Debtor's wife, as tenants by the entireties—meaning that each had the right of survivorship and therefore no probate would have ever affected the Tuscawilla Property.

39.     Additionally, with the intent to hinder, delay, or defraud Linda Diamond as a

creditor, on the same day that Debtor committed the first aforementioned fraudulent conveyance, he executed a quitclaim deed on real property located at 5384 Maldive Avenue, Spring Hill, Florida 34606 ("Maldive Property") to his wife, Diane Schwan, and her daughter, Gale N. Deem, as joint tenants with rights of survivorship.

40. Previously, after he had stolen the monies, including the Fraudulent Advance, and after the Company had demanded the Fraudulent Advance back, Debtor prepared a deed whereby he and his wife conveyed their interest in the Maldive Property to themselves and Gale N. Deem as joint tenants with rights of survivorship. The deed was executed on September 30, 2010, mere months before the state lawsuit was filed.

41. Diane Schwan testified that Debtor conveyed his interest in the Maldive Property in 2012 because she and Debtor "were very afraid" for her daughter[4]—but this cannot be true because she was already on the deed as a joint tenant with right of survivorship pursuant to the 2010 deed.

42. Also belying Diane Schwan's claim is that on the very same day Debtor ostensibly conveyed his interest to his wife and his wife's daughter for the daughter's protection, Debtor's wife and her daughter immediately—on the same day—conveyed their interest in the Maldive Property to Right Time Investments, LLC.

43. Taking the additional step of Debtor conveying his interest first to his wife and his wife's daughter, and then them conveying it to Right Time Investments, instead of all three parties conveying it to Right Time Investments, is a complete absurdity—*unless* one considers the fact that Right Time Investments paid $61,413 for the Maldive Property.

44. No portion of the purchase price for the Maldive Property was never received by Debtor. See: *Id.* at 28:25-29:3.

---

[4] See: *Id.* at 28:6-17.

45. Debtor is also not an owner, officer, member, or manager of Right Time Investments.

46. Additionally, Debtor deposited the Fraudulent Advance into a money market account ending in the numbers 9026. See: Deposition of George Schwan at 13:21-14:2; 15:8-14. Nonetheless, both Debtor and his wife had access to the same accounts wherein they could move money, including the Fraudulent Advance. See: Deposition of Diane Schwan at 52:3-14; 53:4-7.

47. Later, money from his severances and advances[5] from the Company were sent into the possession of his wife, Diane Schwan, who bought homestead property in The Villages with it in her name alone, again, ostensibly (but obviously not) for avoidance of probate purposes.

## RELIEF REQUESTED: THE CASE SHOULD BE DISMISSED

**I.    Legal Standard**

48. Linda Diamond respectfully requests the entry of an order from this Court that dismisses Debtor's Chapter 7 case, with prejudice and for cause, pursuant to 11 U.S.C. § 707(a). Under this code section, a court may dismiss a Chapter 7 case "for cause." In the recent but unequivocal case *In re Piazza*, 719 F. 3d 1253, 1261 (11th Cir. 2013), the Eleventh Circuit holds that a bad faith filing constitutes "cause" for dismissal.

49. There is no exhaustive definition of what might constitute "cause" for dismissal under the Bankruptcy Code, but the Eleventh Circuit held in *In re Piazza* that "prepetition bad faith constitutes 'cause' for involuntary dismissal under § 707(a), because such conduct provides adequate or sufficient reason to dismiss a debtor's case." *Id.* at 1263. A court's examination of bad faith is a fact-intensive inquiry that should be based on a "totality-of-the-circumstances

---

[5] See: *Id.* at 77:1-2.

approach," which assesses dishonest conduct and disingenuous motivations in filing a Chapter 7 case. *Id.* at 1271.

50. The Eleventh Circuit in *In re Piazza* upheld the bankruptcy court's analysis in dismissing the petition based on several factors, but did not hold these factors as always dispositive when it highlighted its "totality-of-the-circumstances" formulation. Nonetheless, the factors that were considered may be helpful here and included:

(i) the debtor reduced his creditors to a single creditor shortly before the petition date;

(ii) the debtor made no life-style adjustments or continued living a lavish life-style;

(iii) the debtor filed the case in response to a judgment, pending litigation, or collection action;

(iv) there is an intent to avoid a large, single debt;

(v) the debtor made no effort to repay his debts;

(vi) the unfairness of the use of Chapter 7;

(vii) the debtor has sufficient resources to pay his debts;

(viii) the debtor is paying debts of insiders;

(ix) the schedules inflate expenses to disguise financial well-being;

(x) the debtor transferred assets;

(xi) the debtor is over-utilizing the protections of the Bankruptcy Code to the unconscionable detriment of creditors;

(xii) the debtor employed a deliberate and persistent pattern of evading a single major creditor;

(xiii) the debtor failed to make candid and full disclosure;

(xiv) the debtor's debts are modest in relation to his assets and income; and

(xv) there are multiple bankruptcy filings or other procedural "gymnastics."

*Id*. at 1259, highlighting factors from *In re Baird*, 456 B.R. 112, 116-17 (Bankr. M.D. Fla. 2010)).

50. The Eleventh Circuit upheld the bankruptcy court's finding that only <u>six</u> of those factors being present constituted "for cause," though under the auspices of the bankruptcy court having engaged in a "totality of the circumstances" analysis. At least <u>seven</u> of those factors are plainly present in this case.

51. The Supreme Court of the United States has said that "[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh' start to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286 (1991)). If so, then there should be no relief afford to this debtor, who is not honest, and merely seeks to put the final piece of a fraud into place.

## II.   Factual Basis for Cause

52. The totality of the facts in this case show that Debtor filed his petition for bankruptcy in bad faith.

53. Linda Diamond is *by far* the single largest creditor in this bankruptcy proceeding.

54. Although Debtor only listed $225,000 as being what is owed—and Linda Diamond would ask the Court to take note that not a single red cent has been paid since the judgment of four years ago—Debtor in fact is liable for much, much more.

55. As calculated on Linda Diamond's proof of claim (#1), as amended, Debtor is liable for at least $90,009.63 in interest (pre- and post-judgment).

56. Pursuant to Florida Statute § 56.29(11), costs necessary to enforce the judgment are taxed against Debtor, and those are $27,472.94 as shown on Linda Diamond's proof of claim (#1), as amended.

57. In total, Debtor is on the hook for $342,482.57 to creditor Linda Diamond.

58. According to Debtor's Petition, Debtor has approximately $9,200.00 in other known debts.

59. Thus, the creditors listed besides Linda Diamond comprise about 2.6% of the total potential known claims in this bankruptcy, while Linda Diamond is the remaining 97.4%.

60. This Court can see that this ratio would not have substantively changed over time, since the judgment obtained by Linda Diamond. The only thing that has changed since 2013 is that Linda Diamond has come appreciably closer to collecting on the judgment.

61. Linda Diamond filed her original complaint initiating supplementary proceedings to collect on the judgment in March 2016 in Case No. 11-3902-ES in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida. The complaint was later amended in August 2016.

62. Linda Diamond's complaint impleads third-party defendants, including Debtor's Wife, in her individual capacity and as a trustee, as well as Right Time Investments, LLC.

63. Debtor and the third-party defendants have tried to evade answering, defending, and dealing with the claims in the complaint, but all parties were ordered to mediation by the presiding circuit judge.

64. Although mediation was unavailing, Linda Diamond believes it probably served as a wake-up call to Debtor and third-party defendants.

65. Shortly after mediation, Debtor discharged his attorney, and, upon information and belief, began making preparations to file a Chapter 7 petition in order to discharge the state court judgment and halt Linda Diamond's collection efforts.

66. The thrust of Linda Diamond's collections litigation is to set aside the fraudulent

conveyances that Debtor made to his wife and Right Time Investments, and to obtain judgments against those third-party transferees pursuant to chapter 726.

67. Additionally, Linda Diamond seeks an equitable lien on Debtor's homestead since it was acquired using the Fraudulent Advance, as has been shown in the depositions and bank records.

68. If the Chapter 7 petition is not dismissed, the claim Linda Diamond is prosecuting will remain the responsibility of the trustee to pursue—and thus the fees for the trustee, and counsel he has retained in this matter, who is at least twice the hourly rate of the undersigned counsel, with far less knowledge of the underlying facts and who would have to re-acquaint himself with all the facts, pleadings, and so on—amounts to a brutally unfair depletion of the bankruptcy estate's assets which should and ought to be available for Linda Diamond as the sole creditor of note.

### III. Legal Basis for Cause

70. Almost all Circuits in the United States have joined together to recognize that petitions for bankruptcy can be dismissed pursuant to § 707(a) upon a finding of bad faith. *BMO Harris Bank N.A. v. Isaacson*, 551 B.R. 376, 380 (N.D. Ill. 2015).

71. Findings of bad faith may encompass "fraudulent conduct by the atypical litigant who has demonstrated that he is not entitled to the relief available to the typical debtor.*" Id.* at 381 (quoting *Marrama*, 549 U.S. at 374-75).

72. If the Court was so inclined to look at the *In re Baird* factors in assessing bad faith as "for cause," as the *In re Piazza* court was, then this Court would find that factors (ii), (iii), (iv), (v), (vi), (vii), (x), (xi), and (xii) are easily present and that there would be no dispute of any material fact as to this. That's **_nine_** factors, whereas the Eleventh Circuit upheld the trial

court's dismissal of the petition based on finding *six* in *In re Piazza*.

73. Of course, this Court is bound by the holding of the Eleventh Circuit to conduct a totality of the circumstances analysis that is not limited by the factors from *In re Baird*.

74. In *In re Lombardo*, 370 B.R. 506 (Bankr. E.D.N.Y. 2007), the bankruptcy court dismissed a petition for Chapter 7 bankruptcy where a debtor was primarily trying to avoid a debt of approximately $53,170.00 she owed to a divorce lawyer, when she also had credit card debts of approximately $8,409.63. Even though in that case, the other debts make up a much larger portion of debts—approximately 14% (five times the amount here)!—the court still found that debtor was solely trying to avoid the single claim regarding attorneys fees. The court noted in *In re Lombardo* that there really was not much change in the other debts warranting a bankruptcy petition, and therefore, debtor was obviously trying to escape the lawyer's fees. The court further found "the presence of several factors… which indicate bad faith on the party of the [d]ebtor." *Id.* at 511. The court considered almost all of the same factors that the court in *In re Baird* did, and is a much weaker case for dismissal because there were no attempts to fraudulently convey property. Yet, the court still dismissed the debtor's petition.

75. In the past several years, the trend of courts has been to sanction debtors for attempting to convert the process by which honest debtors get fresh starts into vehicles to avoid dealing with the consequences of their fraudulent or wrongful actions.

76. The ready and available sanction for those courts, as for this one, is to dismiss the petition for bankruptcy. *In re Blumenberg*, 263 B.R. 704, 716 (Bankr. E.D.N.Y. 2001) (dismissing Chapter 7 case for bad faith where the debtor "abused the bankruptcy process by admittedly seeking to invoke the jurisdiction of this [c]ourt primarily for the purpose of attacking [a] state court judgment"); *In re Wally Findlay Galleries (N.Y.), Inc.*, 36 B.R. 849, 851 (Bankr.

S.D.N.Y. 1984) (dismissing petition for cause where the debtor "[sought] to use the court as an appellate forum to review the state court's grant of summary judgment").

77. In *Nath v. Select Portfolio Servicing Inc.,* 2017 U.S. Dist. LEXIS 49393, the court found that the appellant debtor had primarily been seeking to evade a mortgage lien. But the court there found that "[debtor's] concerns about the soundness of the State Court Foreclosure Judgment are appropriately raised and pursued in the State Court and not—as is relevant for purposes of this appeal—a Chapter 7 petition."

## CONCLUSION

78. Debtor's deposition shows that he believes he "lives in the moment of truth" and will never pay on the judgment:

> Q: Any thoughts on how you're going to repay this judgment?
> A: No, sir.
> Q: You have no intention of repaying it?
> A: I have no thoughts on it.
> Q: Okay. Do you consider it a lawful obligation?
> A: I consider any judgment a lawful obligation.
> Q: And that being the case, do you intend to repay it?
> A: ***I don't consider what the court adjudicated as truth, and I live in the moment of that truth.***

See: Deposition of George Schwan at 37:25-38:12 (emphasis added).[6]

79. This has been true before the instant petition, is certainly true now, and will be true even after the petition is dismissed, hopefully.

80. But Linda Diamond should be able to pursue that judgment, unimpeded by the fraudulent use of this Court to destroy her claim and also by the unfair expenses being accrued by the bankruptcy estate and its litigators that would necessarily come out of any property recovered. Already they are litigating over sideshow items that have no bearing on the root of

---

[6] The Deposition of George Schwan is so full of lies, fabrications, and admissions of lies, fabrications, and evasions that it bears close scrutiny in full.

this entire proceeding. See, generally: [D.E. 11, 12, 14, 15, 16, 17, 22, 26].

81. Most importantly, this Court should dismiss Debtor's petition because it has been filed in bad faith pursuant to 11 U.S.C. § 707(a).

**WHEREFORE**, Linda Diamond respectfully requests that this Court find that Debtor has filed his Chapter 7 petition for bankruptcy in bad faith and dismiss it for cause pursuant to 11 U.S.C. § 707(a), as well as grant any such other relief as the Court deems just and proper.

Respectfully submitted this 9th day of July, 2017.

By: /s/ Christian W. Waugh
CHRISTIAN W. WAUGH
WAUGH LAW, P.A.
13940 US Hwy 441, Suite 906
The Villages, FL  32159
Telephone:  352-750-0325
Fax:   352-750-9522
Email: cwaugh@waughpa.com
Email: rwood@waughpa.com

*Attorney for Creditor Linda Diamond*

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Notice of Appearance and Request for Service of Papers was served by ECF on those parties set up for ECF on this 9th day of July, 2017.

By: /s/ Christian W. Waugh
CHRISTIAN W. WAUGH